# IN THE SUPREME COURT OF CALIFORNIA

JONIE A. HOLLAND et al.,
Plaintiffs and Respondents,

v.

SILVERSCREEN HEALTHCARE, INC.,
Defendant and Appellant.

S285429

Second Appellate District, Division Two
B323237

Los Angeles County Superior Court
22STCV01945

August 14, 2025

Justice Kruger authored the opinion of the Court, in which Chief Justice Guerrero and Justices Corrigan, Liu, Groban, Jenkins, and Evans concurred.

HOLLAND v. SILVERSCREEN HEALTHCARE, INC.

S285429

Opinion of the Court by Kruger, J.

As a general rule, plaintiffs cannot be compelled to arbitrate their disputes if they have not previously agreed to arbitration. But in *Ruiz v. Podolsky* (2010) 50 Cal.4th 838 (*Ruiz*), this court identified an exception for certain wrongful death claims based on medical malpractice. If a patient agreed to arbitrate medical malpractice disputes in compliance with the arbitration provision of the Medical Injury Compensation Reform Act (MICRA) (codified as Code Civ. Proc., § 1295), the patient-provider agreement may bind the patient's heirs in a wrongful death action, even if the heirs themselves never agreed to arbitration. (*Ruiz*, at pp. 849–850.)

The question before us concerns the application of *Ruiz* in a recurring context. Plaintiffs sued a 24-hour skilled nursing facility, alleging that the facility's neglect caused their son's death. Before his death, plaintiffs' son had signed an agreement to arbitrate medical malpractice disputes against the facility. Parting company with appellate courts that had taken different approaches to the issue, the Court of Appeal held that the patient-provider agreement binds plaintiffs because their wrongful death claim based on the nursing facility's neglect is necessarily a claim about the manner in which a health care provider rendered its professional services.

We conclude that the Court of Appeal's decision in this case extends *Ruiz* past statutory bounds. *Ruiz* does not apply to

1

every type of wrongful death claim that might be brought against a health care provider — particularly a provider that, like the skilled nursing facility in this case, provides both medical care and day-to-day custodial care of dependent adults. Under *Ruiz*, plaintiffs' claim must be submitted to arbitration only if they are raising a dispute about medical malpractice as that term is defined in MICRA's arbitration provision — that is, a dispute " 'as to whether any medical services . . . were improperly, negligently or incompetently rendered.' " (Code Civ. Proc., § 1295, subd. (a) (§ 1295(a)).) *Ruiz* does not require plaintiffs to arbitrate their disputes about a facility's neglect of a resident's basic welfare and safety needs.

To the extent the plaintiffs' complaint in this case fails to detail whether they are alleging deficiencies in the nursing facility's rendering of medical services or instead in its provision of custodial care, we conclude that they should be permitted to amend their complaint to specify. We reverse the judgment of the Court of Appeal and remand for further proceedings.

## I.

Skyler A. Womack was a dependent adult with physical and developmental disabilities. In January 2020, he was admitted as an inpatient at a 24-hour skilled nursing facility called Asistencia Villa Rehabilitation and Care Center (Asistencia), operated by Silverscreen Healthcare, Inc. (Silverscreen). Skyler died on October 29, 2020, while still residing at Asistencia.

Following his death, Skyler's parents and heirs, plaintiffs Jonie A. Holland and Wayne D. Womack, filed suit against Silverscreen. Plaintiffs' complaint asserted four causes of action: (1) dependent adult abuse under the Elder Abuse and

Dependent Adult Civil Protection Act, Welfare and Institutions Code, section 15600 et seq. (Elder Abuse Act); (2) negligence; (3) violation of residents' rights under Health and Safety Code, section 1430, subdivision (b); and (4) wrongful death. The first three causes of action are survivor claims brought by Holland as Skyler's successor in interest. The wrongful death cause of action was brought by both plaintiffs in their personal capacity.

In connection with all of these causes of action, plaintiffs alleged that Silverscreen failed to protect Skyler from "multiple falls with injury, and infections which caused him pain and suffering and were substantial factors in his untimely demise." Plaintiffs also alleged that Silverscreen failed to "employ an adequate number of qualified personnel to carry out all of the functions of the facility"; failed to "keep[] its facility in good repair at all times"; failed to "correct deficiencies issued by the State of California's Department of Public Health"; and failed to "provid[e] [Skyler] with good nutrition and necessary fluids for hydration." In connection with their cause of action under the Elder Abuse and Dependent Adult Civil Protection Act (Elder Abuse Act), plaintiffs alleged that Silverscreen "failed to exercise the degree of care that reasonable persons in a like position would exercise by denying or withholding goods or services necessary to meet . . . basic needs" and thus " 'neglected' [Skyler] as that term is defined in Welfare and Institutions Code §[]15610.57," a provision of the Elder Abuse Act defining actionable abuse. Their wrongful death cause of action alleges that Skyler died "[a]s a proximate result of [this] negligence and 'neglect,' " as that term is defined in the Elder Abuse Act.

On admission to Asistencia, Skyler had signed a "Resident-Facility Arbitration Agreement." The agreement provided for arbitration of malpractice claims, adhering to

statutory language and formatting requirements for medical services contracts covering disputes as to the "professional negligence of a health care provider." (§ 1295(a).) It stated that "any dispute as to medical malpractice, that is as to whether any medical services rendered under this contract were unnecessary or unauthorized or were improperly, negligently or incompetently rendered, will be determined by submission to arbitration." (Quoting § 1295(a).) The agreement further provided — in its own language — that the agreement was "binding on all parties, including the Resident's representatives, executors, family members, and heirs."

Based on this agreement and our decision in *Ruiz*, Silverscreen filed a motion to compel arbitration of each of the four causes of action asserted in the complaint. Plaintiffs opposed the petition. They argued that *Ruiz* did not apply because their wrongful death claim was based on Silverscreen's "neglect," as that term is defined under the Elder Abuse Act, and not its "professional negligence."

The trial court granted Silverscreen's motion to compel arbitration of the three survivor claims but denied the motion as to plaintiffs' individual claim for wrongful death.[1] Following the lead of the Court of Appeal in *Avila v. Southern California Specialty Care, Inc.* (2018) 20 Cal.App.5th 835, 843 (*Avila*), the trial court explained that although "[t]he complaint includes allegations that could be categorized as professional negligence

---

[1] Skyler's agreement to arbitrate covered not only medical malpractice claims under Code of Civil Procedure section 1295, but also any dispute relating to Skyler's treatment and care at Asistencia. Holland did not appeal the trial court's determination that the three survivor claims were therefore subject to arbitration.

as well as elder abuse," plaintiffs " 'chose to plead a cause of action under the [Elder Abuse Act], and they did so successfully. The fact that they could have also pleaded a claim for medical malpractice, had they wished to do so, is irrelevant. Accordingly, . . . plaintiffs' claim is not one within the ambit of section 1295, and therefore, *Ruiz*'s holding does not apply.' " (Quoting *Avila*, at p. 843.)

The Court of Appeal reversed. (*Holland v. Silverscreen Healthcare, Inc.* (2024) 101 Cal.App.5th 1125 (*Holland*).) The court began by explaining that the arbitration agreement "complies to the letter with section 1295, subdivisions (a) and (b)," and its "plain language manifests an intent between the parties to bind Skyler's heirs . . . to any claims of professional negligence." (*Id.* at p. 1133.)[2] The court held that "the parents' barebones claim . . . sounds in professional negligence" because "[t]he allegations of understaffing and the failure to prevent Skyler from falling or developing infections speak to 'negligent act[s] or omission[s] to act by a health care provider in the rendering of professional services' which proximately caused Skyler's death." (*Ibid.*, quoting Code Civ. Proc., § 1295, subd. (g)(2).)

The Court of Appeal next rejected plaintiffs' argument that their wrongful death claim "is not subject to *Ruiz* because it is one for dependent adult abuse, not professional negligence." (*Holland, supra*, 101 Cal.App.5th at p. 1133.) The court reasoned that even though "neglect can constitute abuse under

---

[2]     Plaintiffs have not challenged the Court of Appeal's conclusion that the agreement was meant to bind Skyler's heirs; we assume for purposes of this opinion that the Court of Appeal's conclusion was correct.

the Elder Abuse Act," only victims and their successors in interest have standing to pursue remedies under that Act. (*Ibid.*, citing *Quiroz v. Seventh Ave. Center* (2006) 140 Cal.App.4th 1256, 1283 (*Quiroz*) [holding that the enhanced remedies provided under the Elder Abuse Act are not available in "a wrongful death action brought by a decedent's heir on his or her own behalf"].) "[I]f the parents cannot maintain a claim for abuse under the Elder Abuse Act in their own name, it makes no sense for them to be able to pursue a claim for wrongful death based upon that same alleged abuse." (*Holland*, at p. 1134.)

Finally, and in the alternative, the Court of Appeal held that plaintiffs "do not allege with adequate specificity how their claims here constitute dependent adult abuse and not professional negligence." (*Holland*, *supra*, 101 Cal.App.5th at p. 1134.) Raising concerns about permitting plaintiffs to "circumvent *Ruiz* through intentionally opaque pleading," the court directed the trial court to order the parents' wrongful death cause of action to arbitration. (*Id.* at p. 1135.)

The Court of Appeal acknowledged several appellate cases, including *Avila*, in which courts refused to compel arbitration of wrongful death claims predicated on allegations of neglect by nursing homes and similar residential care facilities. (*Holland*, *supra*, 101 Cal.App.5th at p. 1134, citing, inter alia, *Avila*, *supra*, 20 Cal.App.5th at p. 843; *Valentine v. Plum Healthcare Group, LLC* (2019) 37 Cal.App.5th 1076, 1084 (*Valentine*); *Daniels v. Sunrise Senior Living, Inc.* (2013) 212 Cal.App.4th 674, 677, 683–684 (*Daniels*); see also *Hearden v. Windsor Redding Care Center, LLC* (2024) 103 Cal.App.5th 1010, 1018–1019 (*Hearden*) [following *Avila* in decision published shortly after the Court of Appeal's decision in this case].) The Court of Appeal agreed with these cases insofar as

they "confined *Ruiz*'s holding to wrongful death claims predicated on medical malpractice or professional negligence," but it disagreed with the cases to the extent they might suggest that plaintiffs' claim here falls outside *Ruiz*. (*Holland*, at p. 1134; see *id.* at pp. 1134–1135.)

## II.

### A.

Code of Civil Procedure 1295 (§ 1295), was enacted as one of many provisions of MICRA, the Legislature's " 'response to a perceived crisis regarding the availability of medical malpractice insurance' " due to the high cost of coverage. (*Ruiz*, *supra*, 50 Cal.4th at p. 843, quoting *Reigelsperger v. Siller* (2007) 40 Cal.4th 574, 577 (*Reigelsperger*).) Section 1295 was designed to " 'encourage and facilitate arbitration of medical malpractice disputes,' " and thereby to further "MICRA's goal of reducing costs in the resolution of malpractice claims and therefore malpractice insurance premiums" (*Ruiz*, at p. 844). But the Legislature that wrote section 1295 also sought to ensure "that patients are adequately informed of the consequences of entering into arbitration agreements." (*Ruiz*, at p. 849.) To that end, the Legislature prescribed uniform language and formatting requirements aimed at informing signatories that they are giving up their right to bring malpractice claims in court.

Section 1295(a) prescribes mandatory language for inclusion in "[a]ny contract for medical services which contains a provision for arbitration of any dispute as to professional negligence of a health care provider." The statute defines the term " 'professional negligence' " to mean "a negligent act or omission to act by a health care provider in the rendering of

professional services, which act or omission is the proximate cause of a personal injury or wrongful death, provided that such services are within the scope of services for which the provider is licensed and which are not within any restriction imposed by the licensing agency or licensed hospital." (*Id.*, subd. (g)(2).) The statute instructs that every contract with such an arbitration provision "shall have such provision as the first article of the contract and shall be expressed in the following language: 'It is understood that any dispute as to medical malpractice, that is as to whether any medical services rendered under this contract were unnecessary or unauthorized or were improperly, negligently or incompetently rendered, will be determined by submission to arbitration as provided by California law, and not by a lawsuit or resort to court process except as California law provides for judicial review of arbitration proceedings. Both parties to this contract, by entering into it, are giving up their constitutional right to have any such dispute decided in a court of law before a jury, and instead are accepting the use of arbitration.' " (§ 1295(a).)

In addition to the mandatory clause in subdivision (a), subdivision (b) requires the following notice, in at least 10-point bold red type, immediately above the signature line: " 'NOTICE: BY SIGNING THIS CONTRACT YOU ARE AGREEING TO HAVE ANY ISSUE OF MEDICAL MALPRACTICE DECIDED BY NEUTRAL ARBITRATION AND YOU ARE GIVING UP YOUR RIGHT TO A JURY OR COURT TRIAL. SEE ARTICLE 1 OF THIS CONTRACT.' " (§ 1295, subd. (b).)

In *Ruiz*, we considered the interaction between section 1295 and the wrongful death statute. Code of Civil Procedure section 377.60 (section 377.60) provides that specified persons, including a decedent's parents, may assert a cause of action for

death "caused by the wrongful act or neglect of another." (*Id.*; see *Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 390.) In California, wrongful death claims, unlike survivor claims, are not derivative of the decedent's own claims; they are, rather, independent statutory actions accruing to a decedent's heirs for pecuniary injuries suffered by the loss of a relative. (*Ruiz, supra*, 50 Cal.4th at pp. 841, 844; see *Horwich v. Superior Court* (1999) 21 Cal.4th 272, 283.) Because wrongful death claimants are entitled to sue in their own right, not merely as successors in interest to their decedent, they are not ordinarily bound by any arbitration agreement the decedent may have signed. (See *Ruiz*, at pp. 841, 844; *Victoria v. Superior Court* (1985) 40 Cal.3d 734, 744.)

In *Ruiz*, however, we concluded that section 1295 marks an exception to this general rule. As we explained in *Ruiz*, section 1295 by its terms applies to agreements to arbitrate disputes about " ' "professional negligence" ' " — a term specifically defined, as relevant here, to include negligent acts or omissions that cause " 'a personal injury *or wrongful death*.' " (*Ruiz, supra*, 50 Cal.4th at p. 849, quoting § 1295, subd. (g)(2).) Noting that "section 1295 does not distinguish between malpractice claims asserted by the patient or the patient's estate, and wrongful death claims arising out of alleged malpractice committed against the patient," we held that "section 1295 . . . contemplates that *all* medical malpractice claims, including wrongful death claims, may be subject to arbitration agreements between a health care provider and the patient," provided that "the language of the agreement manifests an intent to bind these claimants." (*Ruiz*, at pp. 850, 841, italics added & fn. omitted.) This understanding, we explained, was consistent with the Legislature's purpose to

promote arbitration to control the costs of medical malpractice suits. And a rule permitting patients to bind their heirs to such an agreement would avoid the practical difficulties and potential encroachment on a patient's privacy that would result from a rule that required a patient's heirs to sign an agreement respecting the provision of medical care. (*Id.* at pp. 850–851.) Thus, *Ruiz* held that even if a wrongful death claimant has not signed an arbitration agreement, under section 1295, the claimant can nonetheless be bound by the patient's agreement to arbitrate medical malpractice claims against a medical provider.

**B.**

In the wake of *Ruiz*, a number of courts have considered its application in the context of wrongful death suits against nursing homes or other long-term residential care facilities. In these cases, courts have examined the interplay between the *Ruiz* rule and the Elder Abuse Act.

The Legislature enacted the Elder Abuse Act to protect elders and other dependent adults from "gross mistreatment in the form of abuse and custodial neglect." (*Delaney v. Baker* (1999) 20 Cal.4th 23, 33 (*Delaney*); see generally *ibid.* [tracing the history of the Act].) The central provision of the Act provides "heightened remedies for reckless, oppressive, fraudulent, or malicious" abuse, neglect, or abandonment of an elder or dependent adult. (*Covenant Care, Inc. v. Superior Court* (2004) 32 Cal.4th 771, 781 (*Covenant Care*); see Welf. & Inst. Code, § 15657.) " 'Neglect' " under the Act is defined as "[t]he negligent failure of any person having the care or custody of an elder or a dependent adult to exercise that degree of care that a reasonable person in a like position would exercise." (Welf. &

Inst. Code, § 15610.57, subd. (a)(1).) The Act lists several examples of "neglect," including the failure to: "assist in personal hygiene, or in the provision of food, clothing, or shelter"; "provide medical care for physical and mental health needs"; "protect from health and safety hazards"; and "prevent malnutrition or dehydration." (*Id.*, subd. (b)(1)–(4).)

In a number of cases, including this one, the heirs of persons who have died in the care of long-term care facilities have brought survival claims under the Elder Abuse Act in their capacity as the decedent's successor in interest, as well as independent wrongful death claims based on allegations of "neglect" as understood under that Act. (See Welf. & Inst. Code, § 15600 et seq.; *id.*, § 15610.57; see, e.g., *Avila, supra*, 20 Cal.App.5th at pp. 838–839; *Daniels, supra*, 212 Cal.App.4th at pp. 676–678; *Hearden, supra*, 103 Cal.App.5th at pp. 1014, 1019; *Valentine, supra*, 37 Cal.App.5th at pp. 1083, 1084.) In cases in which the plaintiff's decedent signed an arbitration agreement in compliance with section 1295, the question has arisen whether *Ruiz* required the plaintiffs to arbitrate their wrongful death claims.

In *Avila*, for instance, plaintiffs brought elder abuse and wrongful death claims alleging that a long-term acute care hospital's failure to provide basic care and services resulted in a dislodged feeding tube that caused their father's death. (*Avila, supra*, 20 Cal.App.5th at pp. 838, 843.) The court asked whether "the primary basis for the wrongful death claim sounds in professional negligence as defined by MICRA" or if "the primary basis" for the claim is instead "under the Elder Abuse and Dependent Adult Civil Protection Act." (*Id.* at p. 842.) The court acknowledged that while there was some area of "overlap" between the two, plaintiffs had chosen to plead that their

father's death was caused not by incompetence in the rendering of medical services, but instead by custodial neglect — that is, "a 'conscious and continued pattern of withholding the most basic care and services.' " (*Id.* at p. 843.) For that reason, the *Avila* court concluded that the plaintiffs' claim did not come within section 1295 and that the *Ruiz* rule therefore did not apply. (*Avila*, at p. 843.)

Similarly, in *Hearden, supra*, 103 Cal.App.5th at page 1019, plaintiffs' "elder abuse cause of action . . . alleged the failure to adequately staff the facility, provide basic custodial care to residents, monitor residents, [and] provide sufficient equipment and training to prevent the spread of COVID-19 in the facility." Following the approach set forth in *Avila*, the court held that the primary basis for plaintiffs' wrongful death claim incorporating these allegations was custodial neglect, not medical malpractice, and therefore section 1295 did not apply. (*Hearden*, at p. 1019.)

Finally, in *Valentine, supra*, 37 Cal.App.5th at page 1083, decedent's husband and children asserted elder abuse and wrongful death claims for "reckless neglect and abuse," alleging that a skilled nursing facility repeatedly failed to treat infections and monitor the decedent's worsening condition until decedent became " 'acutely ill' " and developed septic shock. Reasoning that "a patient of a skilled nursing facility can bind her heirs to arbitrate wrongful death claims arising only from medical malpractice, but not from elder abuse," the court held that the trial court did not abuse its discretion in determining that the allegations fell into the latter category. (*Id.* at p. 1084; see *id.* at pp. 1085, 1090.)

In granting Silverscreen's motion to compel arbitration, the Court of Appeal expressed qualified disagreement with *Avila* and subsequent cases, though it did not elaborate on the nature of its disagreement. (*Holland, supra,* 101 Cal.App.5th at p. 1134.) We granted review to address the resulting tension in the case law.

## III.

As this case has been presented to us, the controversy between the parties is a relatively narrow one. Although the Court of Appeal expressed qualified disagreement with *Avila*, Silverscreen affirmatively disclaims any disagreement with *Avila* or intent to call its holding into question. Silverscreen instead argues that the Court of Appeal's decision in this case is entirely consistent with *Avila*: The difference is that here, unlike in *Avila*, plaintiffs' claims of neglect necessarily sound in "professional negligence" within the meaning of section 1295(a), and they therefore fall under the exception articulated in *Ruiz*. (See *Holland, supra,* 101 Cal.App.5th at p. 1133.) We find the argument unpersuasive.

## A.

Not every claim of injury against a health care provider qualifies as a claim of professional negligence that comes within section 1295. By its terms, section 1295 applies only to claims based on negligence in the provision of medical services: The mandatory contract language in subdivision (a) is limited to " 'dispute[s] as to medical malpractice, that is as to *whether any medical services rendered under this contract were unnecessary or unauthorized or were improperly, negligently or incompetently rendered.*' " (§ 1295(a), italics added.) But even setting the contract language aside, our cases are clear that a claim

qualifies as a claim of "professional negligence" under MICRA only if the claim is based on negligence in the provision of medical services.

In *Flores v. Presbyterian Intercommunity Hospital* (2016) 63 Cal.4th 75, for instance, we were tasked with determining "whether negligence in the use or maintenance of hospital equipment or premises qualifies as professional negligence" under MICRA's statute of limitations provision, Code of Civil Procedure section 340.5. (*Flores*, at p. 84; see Code Civ. Proc., § 340.5, subd. (2) [defining professional negligence].) We concluded that the answer to this question depends on whether the duty to maintain equipment or premises is one the hospital owes "by virtue of being a health care provider," as opposed to a general duty shared by all business owners. (*Id.* at p. 88.) The term "professional negligence" covers "[a] hospital's negligent failure to maintain equipment that is necessary or otherwise integrally related to . . . the provision of medical care to a patient." (*Ibid.*) But it does not cover a situation in which, "for example, a chair in a waiting room collapses, injuring the person sitting in it." (*Id.* at p. 89.) That is because "the hospital's duty with respect to that chair is no different from that of any other home or business with chairs in which visitors may sit." (*Ibid.*) In other words, in determining the scope of "professional negligence," we draw the line at acts or omissions to be judged against "the standard of care for medical treatment," not the "more general duty" shared by all Californians to take care to avoid harm. (*Johnson v. Open Door Community Health Centers* (2017) 15 Cal.App.5th 153, 161.) The relevant question is whether the "injury [was] suffered as a result of negligence in rendering the professional services that hospitals and others

provide by virtue of being health care professionals: that is, the provision of medical care to patients." (*Flores*, at p. 88.)

We have previously had occasion to draw this line in cases concerning the interplay between MICRA and the Elder Abuse Act. In *Delaney*, for example, we were asked to consider whether "professional negligence" as defined in MICRA's statute of limitations encompassed allegations of "neglect" under the Elder Abuse Act. (*Delaney*, *supra*, 20 Cal.4th at p. 27.) We said no. (*Ibid.*; see *Covenant Care*, *supra*, 32 Cal.4th at pp. 776, 780 [rejecting defendant nursing facility's argument that plaintiffs' elder neglect claim was one "arising out of the professional negligence of a health care provider" for purposes of Code Civ. Proc. § 425.13, subd. (a)].) "Professional negligence," we held, refers to "negligence in the *undertaking* of medical services," or in other words, "to the performance of medical services in a manner inferior to ' "the knowledge, skill and care ordinarily possessed and employed by members of the profession in good standing." ' " (*Delaney*, at p. 34, italics added, quoting *Flowers v. Torrance Memorial Hospital Medical Center* (1994) 8 Cal.4th 992, 998; accord, *Covenant Care*, at p. 783.) By contrast, custodial neglect refers to the "*failure* of those responsible for *attending* to the basic needs and comforts of elderly or dependent adults" and applies "regardless of their professional standing." (*Delaney*, at p. 34, italics added.) Thus, as a general rule, a plaintiff who alleges wrongful death based on custodial neglect under the Elder Abuse Act is not alleging wrongful death based on medical malpractice. (See *Covenant Care*, at p. 783; *Winn v. Pioneer Medical Group, Inc.* (2016) 63 Cal.4th 148, 159 (*Winn*).)

As these cases have recognized, however, there is potential for confusion "in the fact that some health care institutions, such

as nursing homes, perform custodial functions *and* provide professional medical care." (*Delaney*, *supra*, 20 Cal.4th at p. 34.) In contrast to a hospital or doctor's office, where patients generally go to seek help for discrete medical issues and are discharged upon receiving treatment, residents at a skilled nursing facility receive both medical care and around-the-clock caretaking to satisfy "basic needs that an able-bodied and fully competent adult would ordinarily be capable of managing without assistance." (*Winn*, *supra*, 63 Cal.4th at p. 158; see also Health & Saf. Code, § 1250, subd. (c)(1) [" 'Skilled nursing facility' means a health facility that provides skilled nursing care and supportive care to patients whose primary need is for availability of skilled nursing care on an extended basis"].) In other words, the facility wears multiple hats, rendering services in its capacity as a medical provider as well as in its capacity as custodian of residents' general well-being, which includes responsibilities such as providing nutrition and hydration. This can complicate efforts to draw lines between claims concerning the provision of professional medical services and other services the facilities may provide.[3]

---

[3] In *Delaney*, we explained that the Elder Abuse Act "provides the way out" of any "ambiguity" between allegations of professional negligence and neglect, in that Welfare and Institutions Code section 15657 reaches only " 'acts of egregious abuse' against elder and dependent adults" and excludes "simple" or "mere" negligence in the rendition of medical services. (*Delaney*, *supra*, 20 Cal.4th at pp. 35, 32.) But returning to the subject in *Covenant Care*, we never questioned that "health care provider and elder custodian 'capacities' are conceptually distinct." (*Covenant Care*, *supra*, 32 Cal.4th at p. 785.) "Statutorily, as well as in common parlance, the

Our cases offer guidance. We have explained that only acts or omissions by a skilled nursing facility in its capacity as a health care provider fall under the banner of professional negligence. (See *Covenant Care, supra*, 32 Cal.4th at p. 786.) By contrast, "a failure to fulfill custodial duties owed by a custodian who happens also to be a health care provider . . . is at most incidentally related to the provider's professional health care services." (*Ibid.*) The failure to provide basic necessities, such as assistance in personal hygiene, food, hydration, or clothing, are paradigmatic examples of a failure to fulfill custodial duties. (See *Delaney, supra*, 20 Cal.4th at p. 34; Welf. & Inst. Code, § 15610.57, subd. (b).) The same is true of a failure to provide an adequate and habitable living space or protect from routine safety hazards. (See *Delaney*, at p. 34; Welf. & Inst. Code, § 15610.57, subd. (b).) Similarly, a failure of staff to attend to, monitor, or assist a resident in obtaining appropriate medical care generally falls on the custodial side of the line because such omissions involve "not . . . the *undertaking* of medical services, but . . . the failure to *provide* medical care." (*Covenant Care*, at p. 783.)

Applying these principles in *Covenant Care*, we held that allegations that a skilled nursing facility failed to provide "nutrition, hydration, and medication" and left the patient "in his bed, unattended and unassisted, for excessively long periods," causing death from starvation, dehydration, and sepsis stated a claim of custodial neglect, rather than professional

function of a health care provider is distinct from that of an elder custodian, and 'the fact that some health care institutions, such as nursing homes, perform custodial functions *and* provide professional medical care' [citation] does not mean that the two functions are the same." (*Id.* at p. 786.)

negligence. (*Covenant Care, supra,* 32 Cal.4th at p. 778.) We reached the same conclusion in *Delaney,* where the complaint alleged that a skilled nursing facility's inadequate staffing had left an elder lying in her own waste and without treatment for her advanced bedsores over an extended period of time. (*Delaney, supra,* 20 Cal.4th at pp. 27, 41.)

## B.

Applying the same principles here, we see no way to square the Court of Appeal's decision in this case with the limited scope of section 1295(a), and thus the scope of *Ruiz.* The Court of Appeal in this case concluded that plaintiffs' wrongful death cause of action must be ordered to arbitration, reasoning as follows: "[T]he complaint alleges that Asistencia owed Skyler duties, that Asistencia failed to meet its duties, and that '[a]s a proximate result of negligence and "neglect" . . . [Skyler] died.' The allegations of understaffing and the failure to prevent Skyler from falling or developing infections speak to 'negligent act[s] or omission[s] to act by a health care provider in the rendering of professional services' which proximately caused Skyler's death." (*Holland, supra,* 101 Cal.App.5th at p. 1133.)

This terse holding is not entirely clear. But to the extent the court meant to suggest that plaintiffs' claim falls within section 1295(a) simply because it involves a nursing facility's failure to fulfill its duties to Skyler — no matter the nature of those duties — the court erred. We have squarely rejected the contention that whether an action is based on the professional negligence of a health care provider should "turn on the custodian's licensing status." (*Delaney, supra,* 20 Cal.4th at p. 35; see *Covenant Care, supra,* 32 Cal.4th at p. 784.) In the context of a skilled nursing facility, the operative question is

whether such duties are owed by virtue of being a medical services provider or by virtue of being the custodian of a dependent adult. Claims premised on the manner in which skilled nursing or other long-term care facilities protect the basic welfare and safety of residents fall outside the scope of section 1295(a), and thus outside the scope of *Ruiz*.

Silverscreen attempts to defend the Court of Appeal's decision on a narrower ground. In Silverscreen's view, the Court of Appeal was correct to conclude that plaintiffs' claims sound in professional negligence because the claims are based on a failure to protect Skyler from falls and infection. Silverscreen argues that because "[f]all protection and infection control are ordinary and usual parts of medical professional services," allegations of harm from falls and infections necessarily fall on the "medical" side of the line.

Even this narrower argument sweeps too broadly. Certainly, in some cases, a claim of injury from falls and infection might be based on negligence in prescribing or executing a plan to address a resident's medical needs. But in other cases, the claim of injury might be based on a failure to adequately supervise and render assistance to residents as they undertake daily activities, or the failure to ascertain whether residents need medical treatment despite easily observable physical manifestations of possible illness. While the first sort of claim may sound in professional negligence, the second sort of claim generally does not. (See *Delaney*, *supra*, 20 Cal.4th at pp. 34–35 [drawing this distinction with respect to an allegation of injury based on malnutrition].)

Again, we recognize that this distinction is not always an easy one to draw where, as here, the defendant facility provides

both medical and custodial care. The challenge of drawing a bright line in this context is part of what motivated the court in *Avila*, which asked whether "*the primary basis* for the wrongful death claim sounds in" medical malpractice or in custodial neglect. (*Avila, supra*, 20 Cal.App.5th at p. 842, italics added.) As noted, both parties in this case have agreed that *Avila* states the correct rule, so we have no occasion to further address the issue here. For present purposes, it suffices to observe that section 1295(a) and *Ruiz* do require lines to be drawn. Not every claim of neglect against a long-term nursing facility — not even neglect that takes the form of failure to prevent falls or infection — will qualify as a claim of medical malpractice subject to *Ruiz*. The critical question remains whether the complaint alleges negligent acts or omissions by "health care providers in their capacity as providers" rather than "against custodians and caregivers . . . that may or may not, incidentally, also be health care providers." (*Covenant Care, supra*, 32 Cal.4th at p. 786.) To the extent Silverscreen would pull the latter set of claims into the rubric of *Ruiz*, it extends that decision beyond its statutory bounds.

## IV.

Silverscreen purports to find additional support for its position in *Quiroz, supra*, 140 Cal.App.4th at page 1284, a case concerning standing to bring claims under the Elder Abuse Act. The *Quiroz* court held that because "claims and remedies [under the Act] are afforded only to *victims* of elder or dependent adult abuse," if the victim dies, successors in interest may bring only a "survivor action . . . *on the decedent's behalf*"; they may not bring a claim seeking to vindicate their own, independent interests. (*Ibid.*) Drawing on *Quiroz*, Silverscreen argues that plaintiffs cannot avoid arbitration under section 1295 because

they lack a cognizable wrongful death claim premised on neglect of a dependent adult. Echoing the Court of Appeal, Silverscreen reasons that because "the parents cannot maintain a claim for abuse under the Elder Abuse Act in their own name, it makes no sense for them to be able to pursue a claim for wrongful death based upon that same alleged abuse." (*Holland*, *supra*, 101 Cal.App.5th at p. 1134.)

This argument, too, is unpersuasive. *Quiroz* concerned the standing of a decedent's heirs to assert claims for heightened statutory remedies afforded under the Elder Abuse Act, not standing to seek other available remedies for the abuse and neglect of elders and dependent adults. This context is clearly distinguishable: Plaintiffs do not seek the Elder Abuse Act's heightened remedies for reckless, oppressive, fraudulent, or malicious abuse and there is no reason to believe plaintiffs must have standing to pursue *those* remedies in order to seek remedies under the wrongful death statute for elder abuse or neglect causing death. And in any event, the question before *us* is not whether plaintiffs have standing to pursue a wrongful death claim based on elder abuse or neglect; it is whether their wrongful death claim raises a dispute concerning medical malpractice within the meaning of section 1295(a) and *Ruiz*.

As we have noted, section 377.60 authorizes a wrongful death claim for a death caused "by the wrongful act or neglect" of the defendant. (§ 377.60.) Plaintiffs here have alleged that defendants exhibited the requisite "neglect" by committing " 'neglect' " as that term is defined in the Elder Abuse Act. (Welf. & Inst. Code, § 15610.57, subds. (a)(1), (b)(1)–(4).) Plaintiffs' theory is that insofar as section 377.60 requires that claimants plead an "underlying tort" (*B.B. v. County of Los Angeles* (2020) 10 Cal.5th 1, 31 (conc. opn. of Liu, J.)), it "broadly incorporates

. . . 'wrongful acts' prohibited by other statutes as a basis for a wrongful death action," including "a defendant's 'wrongful act' of 'neglect' under the Elder Abuse Act." In other words, their theory of wrongfulness borrows from the description of conduct prohibited by the Elder Abuse Act, but their claim remains one of wrongful death under section 377.60.

Silverscreen contends that plaintiffs have forfeited this argument. There is no basis for this contention. It should not come as a surprise to Silverscreen that, in raising a separate cause of action for wrongful death, plaintiffs were in fact invoking the wrongful death statute. (Cf. *Buxbom v. Smith* (1944) 23 Cal.2d 535, 542 ["The subject matter of an action and the issues involved are determinable from the facts alleged rather than from the title of the pleading or the character of damage recovery"]; *People v. Picklesimer* (2010) 48 Cal.4th 330, 340 [" '[T]he label given a petition, action or other pleading is not determinative' "], quoting *Escamilla v. Department of Corrections & Rehabilitation* (2006) 141 Cal.App.4th 498, 511.) In any event, plaintiffs repeatedly made clear, including in their opposition to Silverscreen's motion to compel arbitration and their respondents' brief before the Court of Appeal, that they brought their wrongful death claim as an independent claim under section 377.60. And even though the Court of Appeal adopted Silverscreen's view of the relevance of *Quiroz*, it clearly recognized that plaintiffs' "cause of action for wrongful death exists by statute, giving a decedent's heirs a totally new right of action," and it explicitly cited section 377.60. (*Holland, supra,* 101 Cal.App.5th at p. 1132.)

Silverscreen also argues that even if plaintiffs could bring a wrongful death claim premised on neglect, their allegations fail to establish "neglect" as defined under the Elder Abuse Act

because "[t]here are no allegations that Silverscreen 'denied or withheld goods or services necessary to meet [Skyler Womack's] basic needs, either with knowledge that injury was substantially certain to befall the elder or dependent adult (if the plaintiff alleges oppression, fraud or malice) or with conscious disregard of the high probability of such injury (if the plaintiff alleges recklessness).' " (Quoting *Carter v. Prime Healthcare Paradise Valley LLC* (2011) 198 Cal.App.4th 396, 406–407.) Silverscreen appears to be particularly concerned with the mental state required to trigger heightened remedies under the Elder Abuse Act. This argument distracts from the question before us, which concerns not whether plaintiffs have adequately pleaded a claim of neglect under the Elder Abuse Act, but whether their claims can be compelled to arbitration because they raise a dispute about medical malpractice.

We recognize that several Courts of Appeal have determined whether or not claims are subject to *Ruiz* by asking whether the plaintiff "successfully" raised a claim of elder or dependent adult abuse under the Elder Abuse Act. (*Avila*, *supra*, 20 Cal.App.5th at p. 843; see *id.* at p. 842 [holding that because "the primary basis [of the claim] is under the Elder Abuse and Dependent Adult Civil Protection Act . . . section 1295 does not apply"]; see *Hearden, supra*, 103 Cal.App.5th at pp. 1018–1019 [similar].) Properly understood, however, these cases do not stand for the proposition that the applicability of *Ruiz* turns on whether the plaintiff has adequately pleaded a separate statutory cause of action under the Elder Abuse Act. Rather, as explained above, determining whether the complaint alleges wrongful death through "neglect," as that term is defined in the Elder Abuse Act, serves as a useful shorthand for the inquiry prescribed by *Ruiz* because elder or dependent adult

neglect is defined in a way that excludes "professional negligence" as understood in the MICRA context. (See *Hearden*, at pp. 1018–1019 ["Elder neglect does not refer to substandard performance of medical services but rather the failure of those responsible for attending to the basic needs and comforts of elderly or dependent adults, regardless of their professional standing, to carry out their custodial obligations"]; *Covenant Care*, *supra*, 32 Cal.4th at p. 783; *Delaney*, *supra*, 20 Cal.4th at pp. 31, 34.) The dispositive inquiry for purposes of *Ruiz* is ultimately whether the plaintiff is raising a dispute about medical malpractice, not whether the plaintiff has adequately alleged a claim under any particular statutory or common law cause of action.

## V.

Finally, again echoing the Court of Appeal, Silverscreen argues that even if "a cause of action for statutory dependent adult abuse is distinct from one for medical malpractice," plaintiffs cannot avoid arbitration under section 1295 because they "do not allege with adequate specificity how their claims here constitute dependent adult abuse and not professional negligence." (*Holland*, *supra*, 101 Cal.App.5th at p. 1134.) Silverscreen contends that, in the words of the appellate court, allowing plaintiffs to avoid arbitration despite their "barebones claim" would effectively allow them "to circumvent *Ruiz* through intentionally opaque pleading." (*Id.* at pp. 1133, 1135.)

We can readily agree with Silverscreen and the Court of Appeal that plaintiffs' pleadings in this case are spare. Most critically, the complaint lacks allegations connecting the factual predicate of the claim to the claim of injury: The complaint states that Skyler's falls and infections occurred as a result of

Asistencia's neglect but does not explain *how* Asistencia's alleged understaffing, failure to keep its facility in good repair, and failure to attend to Skyler's basic needs caused Skyler to fall or incur infections, leading to his eventual death. Without more information, it is impossible to assess whether plaintiffs' wrongful death claim is based on the negligent rendering of medical services (in which case *Ruiz* applies), or instead on the facility's nonmedical neglect (in which case it does not).

But we see no evidence that plaintiffs intentionally sought to circumvent application of section 1295 through opaque pleading. While the complaint would undoubtedly benefit from greater specificity in its allegations, we cannot agree with Silverscreen that it is appropriate to compel arbitration at this juncture, while there remains substantial uncertainty about whether plaintiffs seek to challenge the defendants' provision of medical care, its provision of custodial care, or both. As plaintiffs note, "the purpose of a motion to compel arbitration is not to test the legal sufficiency of a plaintiff's claims; it is to compel the plaintiff to litigate those claims in an arbitral forum." We conclude that the appropriate disposition in this procedural posture is to give plaintiffs a chance to provide additional details on remand before determining whether their wrongful death

claim falls within the scope of section 1295 and thus must be ordered to arbitration.[4]

## VI.

We reverse the judgment of the Court of Appeal and remand for proceedings consistent with this opinion.

**KRUGER, J.**

**We Concur:**

**GUERRERO, C. J.**
**CORRIGAN, J.**
**LIU, J.**
**GROBAN, J.**
**JENKINS, J.**
**EVANS, J.**

---

[4] At oral argument, Silverscreen acknowledged that allowing plaintiffs leave to amend is the procedurally appropriate course if we believe more specific allegations are necessary to determine whether plaintiffs' wrongful death claim is premised on a legal theory that renders the claim subject to arbitration under section 1295 and *Ruiz*.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  Holland v. Silverscreen Healthcare, Inc.

_____

**Procedural Posture** (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)** XX 101 Cal.App.5th 1125
**Review Granted (unpublished)**
**Rehearing Granted**

_____

**Opinion No.** S285429
**Date Filed:**  August 14, 2025

_____

**Court:**  Superior
**County:**  Los Angeles
**Judge:**  Michelle Williams Court

_____

**Counsel:**

Lewis Brisbois Bisgaard & Smith, Lann G. McIntyre, Tracy D. Forbath, Kathleen M. Walker, Jeffrey S. Healey and Raymond K. Wilson, Jr., for Defendant and Appellant.

Cole Pedroza, Curtis A. Cole and Cassidy C. Davenport for California Medical Association, California Dental Association and California Hospital Association as Amici Curiae on behalf of Defendant and Appellant.

Hooper, Lundy & Bookman and Mark E. Reagan for California Association of Health Facilities, Flagstone Healthcare North, LLC, Flagstone Healthcare Central, LLC, and Flagstone Healthcare South, LLC, as Amici Curiae on behalf of Defendant and Appellant.

Peck Law Group, Steven C. Peck, Adam J. Peck; Klapach & Klapach and Joseph S. Klapach for Plaintiffs and Respondents.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Tracy D. Forbath
Lewis Brisbois Bisgaard & Smith LLP
550 West C Street, Suite 1700
San Diego, CA 92101
(619) 699-4964

Joseph S. Klapach
Klapach & Klapach, P.C.
15303 Ventura Boulevard, Suite 1510
Sherman Oaks, CA 91403
(310) 525-3724